UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

     - against -

MIGUEL PADILLA,

           Defendant.

------------------------------------X

09 Cr. 853-01 (RWS)

<u>SENTENCING OPINION</u>

**Sweet, D.J.**


On September 3, 2009, Miguel Padilla, ("Padilla" or "Defendant") pleaded guilty to four counts of intentional murder with engaged in a drug trafficking crime, in violation of 21 U.S.C. § 841(e)(1)(A).  For the reasons set forth below, Padilla will be sentenced to 240 months' imprisonment to be followed by 5 years' supervised release, subject to the scheduled sentencing hearing.  Padilla will also be required to pay a special assessment of $400.


**<u>Prior Proceedings</u>**


On September 3, 2009, Indictment 09 CR 853 (RWS) was filed in the Southern District of New York.  Count 1 charges that on September 3, 1994, in the Southern District of New York,

1

while engaged in a conspiracy to distribute fifty grams and more of mixtures and substances containing a detectable amount of cocaine base, in a form commonly known as "crack," Padilla and others intentionally, and knowingly killed, and counseled, commanded, induced, procured, and caused the intentional killing of Livino Ortega in the vicinity of Minford Place and East 173rd Street, Bronx, New York, in violation of 21 U.S.C. § 848(e)(1)(A).

Count 2 charges that on September 3, 1994, in the Southern District of New York, while engaged in a conspiracy to distribute fifty grams and more of mixtures and substances containing a detectable amount of cocaine base, in a form commonly known as "crack," Padilla and others intentionally, and knowingly killed, and counseled, commanded, induced, procured, and caused the intentional killing of Fernando Garrido, a/k/a "Fernando Reyes," in the vicinity of Minford Place and East 173rd Street, Bronx, New York, in violation of 21 U.S.C. § 848(e)(1)(A).

Count 3 charges that on October 9, 1994, in the Southern District of New York, while engaged in a conspiracy to distribute fifty grams and more of mixtures and substances

containing a detectable amount of cocaine base, in a form commonly known as "crack," Padilla and others intentionally, and knowingly killed, and counseled, commanded, induced, procured, and caused the intentional killing of Leonard Overman, a/k/a "Boo," in the vicinity of Crotona Park and Southern Boulevard, Bronx, New York, in violation of 21 U.S.C. § 848(e)(1)(A).

Count 4 charges that on December 13, 1994, in the Southern District of New York, while engaged in a conspiracy to distribute and to possess with intent to distribute fifty grams and more of mixtures and substances containing a detectable amount of cocaine base, in a form commonly known as "crack," Padilla and others intentionally, and knowingly killed, and counseled, commanded, induced, procured, and caused the intentional killing of Carmen Diaz, in the vicinity of 1993 Bathgate Avenue, Bronx, New York, in violation of 21 U.S.C. § 848(e)(1)(A).

On September 3, 2009, Padilla appeared before the Honorable Harold Baer, Jr. in the Southern District of New York and pleaded guilty to Counts 1 through 4.

On March 30, 2011, the Court received a letter from

3

Padilla's counsel and family members requesting that Court be lenient when imposing a sentence in light of Padilla's family commitments, potential to improve himself, and potential to have a normal life.

Padilla's sentencing is currently scheduled for April 5, 2011.

**The Sentencing Framework**

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the advisory Guidelines.  Thus, the sentence to be imposed here is the result of a consideration of:

>    (1)  the nature and circumstances of the offense and
>         the history and characteristics of the defendant;
>
>    (2)  the need for the sentence imposed —
>
>         (A)  to reflect the seriousness of the offense,
>              to promote respect for the law, and to
>              provide just punishment for the offense;
>
>         (B)  to afford adequate deterrence to criminal
>              conduct;

4

> > > (C) to protect the public from further crimes of the defendant; and
> >
> > > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> >
> > (3) the kinds of sentences available;
> >
> > (4) the kinds of sentence and the sentencing range established for —
> >
> > > (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;
> >
> > (5) any pertinent policy statement . . . [issued by the Sentencing Commission];
> >
> > (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> >
> > (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not.  See Crosby, 397 F.3d at 114-15.


**The Defendant**

The Court adopts the facts set forth in the

5

Presentence Investigation Report ("PSR") with respect to Padilla's personal and family history.

**The Offense Conduct**

The following description draws from the PSR. The specific facts of the underlying conduct are adopted as set forth in that report.

**Background**

In the early to mid 1990s, Padilla was a member of a crew that ran a retail crack cocaine spot at 173rd Street and Boston Road in the Bronx. The spot was "owned" by Ramon Flores and his identical twin brothers, Omar Flores and Leonardo Flores. The crew called itself "Oro Solido," or "Solid Gold," after a song that was then popular in the Dominican community, and which was also a reference to the gold caps the crew used on their crack vials. Solid Gold ran the Boston Road spot from roughly 1992 to 1997.

At its peak, the Boston Road spot sold approximately a kilogram of crack cocaine a week. Solid Gold employed numerous

6

persons at the spot, including managers who ran the day to day drug business, stash house workers who bagged the crack in individual packets and bundles so it could be sold to Solid Gold's customers, and "pitchers," who conducted the actual sales of crack cocaine at the drug spot.  Padilla worked off and on at the drug spot for a number of years, primarily as a manager. Padilla, who was familiar with the New York metropolitan area, also acted as a driver for Ramon Flores.

During the course of its existence, Solid Gold maintained a number of stash houses which members used to store crack cocaine and numerous firearms, including in an apartment, which was in a building directly across the street from the spot used to conduct the drug sales.  The firearms were accessible to members of Solid Gold, including Padilla.   The firearms were used by various members of Solid Gold to intimidate, threaten, and murder Solid Gold's drug rivals.   Members and associates of Solid Gold committed a number of murders and numerous shootings in 1994 to protect its lucrative drug turf at 173rd Street and Boston Road.  As described in detail below, Padilla was involved in planning and carrying out four such murders.

7

**The Murders of Livino Ortega and Fernando Garrido at Minford Place**

On September 3, 1994, Livino Ortega, a crack dealer, and his friend, Fernando Garrido, were shot as they stood near a gas station on Minford Place and 173rd Street in the Bronx, within 100 feet of Solid Gold's drug spot. Both Ortega and Garrido died as a result of their gunshot wounds.

The Solid Gold crew had been having problems with Ortega, who was selling crack cocaine in close proximity to the Solid Gold spot and who was directly competing with Solid Gold for customers. As a result, members of the Solid Gold crew had several confrontations with Ortega. Solid Gold was also having problems with Leonard Overman, a/k/a "Boo," who had owned the Solid Gold drug spot before Solid Gold's predecessor, Jimmy Feliz. Since being released from jail, Overman had made it clear that he wanted the drug spot back for himself and his partner, Alvino Wade. Things became so heated that, at one point, members of Solid Gold armed themselves with guns and prepared to shoot at Overman and Wade from the rooftop of 1669 Boston Road. The attempt to shoot Wade was unsuccessful as he managed to evade the gunfire and get away.

On the day Ortega and Garrido were killed, members of Solid Gold, including Padilla, Ramon Flores, Leonardo Flores, and Antonio Guerrero, sought out Overman to kill him.  Their plan was prompted when Overman assaulted one of the Solid Gold workers at the drug spot.  When the crew was unable to find Overman that day, however, they returned to Boston Road.  Once there, the crew decided that, since they were armed and prepared, they might as well take the opportunity to kill Ortega.

In preparation for the anticipated shooting of Overman, Guerrero had armed himself earlier that day with a 9 millimeter firearm, which he had retrieved from his apartment on Boston Road.  Padilla drove Guerrero to a location around the corner from Minford Place.  Ortega and Garrido were standing near the corner of Minford Place.  After dropping off Guerrero, Padilla drove down Minford Place where he sat idling in his car, waiting for Guerrero to execute the shootings.  Guerrero, his face obscured by the hood of his sweatshirt, walked to the corner of 173rd Street and Minford Place and shot Ortega in the head at close range.  Guerrero then shot Fernando Garrido, who had been standing with Ortega, in the back.

After the shootings, Guerrero then got back into the white van in which Padilla was waiting for him down the block. Padilla drove a few blocks away, where he and Guerrero regrouped with Ramon and Leonardo Flores, who were waiting there in Leonardo Flores's burgundy car.  Guerrero got out of the white van and into the burgundy car and announced that "I killed him." Leonardo Flores then drove away.  Padilla, still driving the white van, disposed of the murder weapon.

Ortega, who sustained three gunshot wounds, died on the spot.  Garrido, who sustained a single gunshot wound to the back, died some hours later at a hospital in the Bronx.

**The Murder of Leonard Overman and the Non-Fatal Shooting of Alvino Wade on Southern Boulevard**

A couple of weeks after the murders of Ortega and Garrido, the crew renewed its efforts to kill Overman and his partner, Wade.  Padilla recruited Edwin Maldonado, a member and associate of Solid Gold, to commit the murder.  On the morning of the murder, October 9, 1994, Padilla, Ramon Flores, and Edwin Maldonado met at the apartment of Ramon Flores's girlfriend, which was a short distance from the spot on Southern Boulevard where Overman regularly sold marijuana.  Maldonado was wearing a

sweatshirt with a hood tied tightly around his face.  Maldonado had been given a .357 caliber revolver by members of Solid Gold.

After confirming that Overman was at his spot on Southern Boulevard, Maldonado, Padilla, and Flores left the apartment, and Maldonado got on a dirt bike and proceeded to Overman's drug spot.  Maldonado later described to the crew members how he murdered Overman and shot Wade.  According to Maldonado, the shot to Overman's head was so powerful that Overman's brains splattered in the street.  Overman was killed but Wade survived.  Padilla and Maldonado later discarded the murder weapon by throwing it off a bridge in the vicinity of 174th Street in the Bronx.

**The Trial and Conviction of Leonardo Flores for the Murders of Ortega, Garrido, and Overman**

On October 12, 1994, Leonardo Flores, a/k/a "Roberto Mercado," was arrested and ultimately charged with the murders of Livino Ortega, Fernando Garrido, and Leonard Overman. Leonardo Flores was convicted based almost exclusively on the testimony of three eyewitnesses to the murders, all of whom testified that they saw Leonardo Flores shoot the victims at point blank range.  Ultimately, the two living eyewitnesses

recanted their testimony to federal agents who were re-investigating the murders.

One of the living eyewitnesses, Omar Camacho, who was sixteen years old at the time Ortega and Livino were murdered, had initially claimed – and testified at the state trial – that he saw the shooting, saw the shooter's face, and knew who the shooter was. Camacho later admitted that he never saw a shooter at all, and had made up the version of events he later told to the police at the urging of his stepfather.

The other living eyewitness, Alvino Wade, later admitted that although he was in close proximity to the shooter, he could not, in any event, make an identification because the shooter's face was almost entirely obscured by the hood of his sweatshirt. Wade further admitted that, although he never saw the shooter's face, he had no problem implicating Leonardo Flores because he knew that the shooter was a member of Solid Gold and he did not particularly care which crew member went to prison for the murder.

The third eyewitness, Ruben Negron, who has since died, claimed that he was able to identify the shooter from his

12

parking lot, approximately 180 feet away from the shooting, despite the fact that the shooter had a hood on his head.   In addition, Negron's version of events changed substantially over time.   For example, Negron failed to inform the police in his initial statement that he knew the shooter, a claim he only made after viewing an array containing a photograph of Leonardo Flores, who was known to him as a neighborhood thug.   Negron also failed to tell the authorities, until days before the trial commenced a year and a half later, that the shooter had on one occasion threatened Negron with a gun and claimed that he killed people for a living.

Camacho, Negron, and Wade all testified against Leonardo Flores at his trial in 1996.   There was no physical evidence connecting Leonardo Flores to the murders.

Leonardo Flores was convicted of three counts of murder, plus the non-fatal shooting of Wade.   He was sentenced to 25 years to life on each murder count, the sentences to run consecutively.

As a result of evidence developed during the federal investigation into the murders of Ortega, Livino, and other

homicides committed by the Solid Gold crew, including the recantations of Wade and Camacho, Leonardo Flores, through counsel, made a motion to set aside the New York State convictions based on newly-discovered evidence.  The motion was granted.  Leonardo Flores's prior convictions were vacated and Flores pleaded guilty in State Court to the September 3, 1994 murders of Ortega and Livino as an accessory.  He was sentenced to fifteen years to life in state prison.

**The Murder of Carmen Diaz and the Non-Fatal Shooting of Genero Rodriguez on Bathgate Avenue**

On December 13, 1994, Carmen Diaz, a young teenager, was shot and fatally wounded on Bathgate Avenue in the Bronx by Edwin Maldonado.

In September 1994, Johnny Cedeño, an associate of members of Solid Gold, pled guilty to criminal possession of a weapon in the second degree and was sentenced to three to six years of incarceration.  At the time of his arrest, Cedeño ran a retail crack cocaine spot in the vicinity of Bathgate Avenue and 178th Street in the Bronx and was involved in an ongoing turf war with Genero Rodriguez, a/k/a "Jay."  Rodriguez sold heroin on the same block as Cedeño.  At the time, Rodriguez lived at

14

1993 Bathgate Avenue with his girlfriend and her daughter, Carmen Diaz.

Cedeño had a close relationship with members of Solid Gold. In fact, Cedeño taught Ramon Flores how to efficiently cook crack cocaine. Moreover, prior to Cedeño's arrest, members of Solid Gold provided Cedeño with the crack he sold on Bathgate Avenue. After Cedeño's arrest, Solid Gold essentially ran Cedeño's crack business at Bathgate Avenue for Cedeño. While Cedeño was serving his sentence, he and members of Solid Gold arranged for Rodriguez to be killed and for Solid Gold to continue selling crack at Cedeño's spot. Padilla again recruited Edwin Maldonado to do the murder because Cedeño had admired the manner by which Maldonado had killed Leonard Overman. Members of Solid Gold – Ramon Flores, Omar Flores, and Padilla – traveled to Orleans Prison in upstate New York where they met with Cedeño to discuss and plan the murder of Rodriguez and the arrangements to pay Maldonado to commit the crime. The Flores brothers and Padilla also spoke frequently to Cedeño by phone in the days leading up to the Bathgate shootings, using the telephone of one of Cedeño's closest drug associates.

On the day of the shootings, Maldonado proceeded on a bicycle towards Bathgate Avenue. Padilla, who had come up with the specific murder plan to be executed by Maldonado that day, including Maldonado's use of a bicycle to get to the murder scene, and his escape route, was in close proximity to the Bathgate location. Maldonado approached Rodriguez, who was standing in front of 1993 Bathgate Avenue. Carmen Diaz was in the vestibule of the building. Using a gun provided to him by Solid Gold, Maldonado shot both Rodriguez and Diaz numerous times. On January 1, 1995, about two weeks after she was shot, Carmen Diaz died of the gunshot wounds she had sustained. Rodriguez survived the shooting.

Padilla later gave Maldonado money in payment for the shooting.

**The Relevant Statutory Provisions**

For Counts 1-4, pursuant to 21 U.S.C. § 848(e)(1)(A), the mandatory minimum term of imprisonment is 20 years and the maximum term of imprisonment is life imprisonment. It is noted that Defendant is subject to an undischarged term of imprisonment. Pursuant to the § 5G1.3(c) Policy Statement, in a

16

case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense.

For each count, if a sentence of imprisonment is imposed, the Court may impose a term of supervised release of not more than five years, pursuant to 18 U.S.C. § 3583(b)(1). Such terms of supervised release are to run concurrently, pursuant to 18 U.S.C. § 3624(e).

For each count, Defendant is not eligible for probation because the instant offenses are class A felonies, pursuant to 18 U.S.C. § 3561(a)(1).

The maximum fine that may be imposed for each count is $250,000, pursuant to 18 U.S.C. § 3571. A special assessment of $100 per count is mandatory, pursuant to 18 U.S.C. § 3013.

**The Guidelines**

The November 1, 2010 edition of the United States

17

Sentencing Commission Guidelines Manual has been used in this case for calculation purposes, pursuant to § 1B1.11(a).  The Court finds the following with respect to Defendant's applicable offense level, criminal history, recognition of responsibility, and term of imprisonment:

Regarding Counts 1-4, the guideline for the violation of 21 U.S.C. § 848(e)(1)(A) is found in § 2A1.1.  Offenses committed under § 2A1.1 are expressly excluded from grouping, pursuant to § 3D1.2.  Therefore, separate calculations shall be performed for each Count.

For each Count, the guideline for a violation of 21 U.S.C. § 848(e)(1)(A) is found in § 2A1.1(a), which provides for a base offense level of 43, which is also each count's total adjusted offense level.

Pursuant to § 3D1.4, the multiple count adjustment requires the addition of one point per offense to the greater of the adjusted offense levels (43).  The combination of the four counts yields a four point increase in the offense level.

Based on his plea allocution, Defendant has shown

18

recognition of his responsibility for the offense.  Pursuant to
§ 3E1.1(a), the offense is reduced two levels.  Furthermore, an
additional one-level reduction is warranted, pursuant to
§ 3E1.1(b), because Defendant gave timely notice of his
intention to enter a plea of guilty, thereby permitting the
Government to avoid preparing for trial and permitting the Court
to allocate its resources efficiently.

Accordingly, the applicable offense level is 44.

On March 31, 1996, Padilla was arrested and charged
with menacing in the third degree.  On August 9, 1996, Padilla
was sentenced in the Schenectady City Court to a conditional
discharge after his guilty plea.  Pursuant to §§ 4A1.1(c) and
4A1.2(e)(2), this conviction warrants one criminal history
point.

On February 13, 1997, Padilla was arrested and charged
with criminal possession of a controlled substance.  On January
21, 1998, Padilla was sentenced in the Schenectady City Court to
three to nine years' imprisonment after his guilty plea.  He was
paroled on September 3, 1998 and discharged on November 19,
2001.  Pursuant to §§ 4A1.1(a) and 4A1.2(e)(1), this conviction

warrants three criminal history points.

On June 24, 1999, Padilla was arrested and charged with aggravated unlicensed operation of a motor vehicle in the second degree.  On December 7, 1999, Padilla was convicted upon a guilty plea in the Bronx Criminal Court.  On December 25, 2000, Padilla was sentenced to three years' probation and a $750 fine.  On January 27, 2003, he was discharged.  Pursuant to § 4A1.2(c)(1), this conviction warrants zero criminal history points.

On October 5, 2004, Padilla was arrested and charged with conspiracy to commit Hobbs Act robbery.  On March 2, 2007, Padilla was sentenced in the United States District Court for the Southern District of New York to 96 months' imprisonment and three years' supervised release.  Pursuant to § 4A1.1(a), this conviction warrants three criminal history points.  This brings the total of Defendant's criminal history points to seven.

A total of seven criminal history points establishes a Criminal History Category of V, pursuant to the table at Chapter 5, Part A, of the Guidelines.

20

Based on a total offense level of 43[1] and a Criminal History Category of V, the guideline for imprisonment is life imprisonment.

On each count, the Guidelines range for a term of supervised release is three to five years, pursuant to § 5D1.2(a)(1). If a sentence of imprisonment of one year or less is imposed, a term of supervised release is not required but is optional, pursuant to § 5D1.1(b).

Defendant is not eligible for probation because the instant offenses are class A felonies, pursuant to § 5B1.1(b)(1).

The fine range for the instant offense is $25,000 to $250,000, pursuant to § 5E1.2(c)(3)(A). Subject to Defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation, or supervised release pursuant to § 5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of $2,270.93 to be used for imprisonment, a monthly cost of $317.32 for supervision, and

---

[1] The Guidelines table only goes as high as 43.

a monthly cost of $2,063.19 for community confinement.

## The Remaining Factors of 18 U.S.C. § 3553(a)

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," as is required by the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103.   In light of the Court's statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," Kimbrough v. United States, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a)), and having considered the Guidelines and all of the factors set forth in § 3553(a), it is determined that a downward departure from the Guidelines sentence is warranted in the instant case in light of Defendant's personal and family circumstances.

## The Sentence

For the instant offense, Padilla will be sentenced to 240 months' imprisonment and 5 years' supervised release.   This

22

sentence shall run consecutive to Defendant's undischarged term of imprisonment.

Padilla is directed to report to the nearest United States Probation Office within seventy-two hours of release to commence his term of supervised release. It is recommended that Padilla be supervised by the district of his residence.

As mandatory conditions of his supervised release, Padilla shall: (1) not commit another federal, state, or local crime; (2) not illegally possess a controlled substance; (3) not possess a firearm or destructive device; (4) shall refrain from any unlawful use of a controlled substance; and (5) shall submit to one drug testing within fifteen (15) days of placement on probation or supervised release and at least two unscheduled drug tests thereafter, as directed by the probation officer.

Furthermore, the standard conditions of supervision (1-13), set forth in the judgment, shall be imposed with the additional special condition:

(1) Defendant shall submit his person, residence, place of business, vehicle, or any other premises under his

23

control to a search on the basis that the probation officer has reasonable belief that contraband or evidence of a violation of the conditions of the release may be found.  The search must be conducted at a reasonable time and in a reasonable manner. Failure to submit to a search may be grounds for revocation. Defendant shall inform any other residents that the premises may be subject to search pursuant to this condition.

In consideration of all the factors set forth in 18 U.S.C. § 3572(a), it does not appear that the Defendant is able to pay a fine, and so the fine in this case shall be waived.

A special assessment of $400, payable to the United States, is mandatory and shall be due immediately.

The terms of this sentence are subject to modification at the sentencing hearing scheduled for April 5, 2011.

It is so ordered.

New York, NY
April    /    , 2011

ROBERT W. SWEET
U.S.D.J.